**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KAREN LANGENFELD,**

      **Plaintiff,**　　　　　　　　　　**Case No. 2:13-cv-469**
　　　　　　　　　　　　　　　　　　**JUDGE GREGORY L. FROST**
**v.**　　　　　　　　　　　　　　　**Magistrate Judge Mark R. Abel**

**ARMSTRONG WORLD INDUSTRIES,
INC.,**

      **Defendant.**

**<u>OPINION AND ORDER</u>**

This matter is before the Court for consideration of Defendant Armstrong World

Industries, Inc.'s motion for summary judgment (ECF No. 41),[1] Plaintiff's memorandum in

opposition (ECF No. 51), and Armstrong's reply memorandum (ECF No. 56).  For the reasons

that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

I.      **BACKGROUND**

Armstrong World Industries, Inc. ("AWI") is a company that specializes in the design

and manufacture of ceiling tiles and flooring products.  Armstrong Building Products ("ABP"

and, together with AWI, "Armstrong") is a division of AWI that operates manufacturing plants

throughout the United States and Europe.

In 2010, Armstrong began to implement a process called "lean transformation" (also

called "lean") into its manufacturing plants.  The purpose of lean is to optimize technology and

product flow to maximize value and minimize waste.  According to Armstrong, lean

transformation efforts often are met with resistance from long-term employees.

---

[1] Armstrong also filed a duplicate of its motion for summary judgment at ECF No. 42.

Armstrong hired Plaintiff as a Director of Lean Deployment on May 3, 2010.  In that capacity, Plaintiff was responsible for leading a cultural transformation in Armstrong's manufacturing plants to implement lean.  Plaintiff therefore was responsible for working with plant leaders, many of whom resisted the lean transformation changes.  Plaintiff asserts that she was the only female Director-level employee in Armstrong's lean organization.

In December 2010, after Plaintiff had been working at Armstrong for approximately six months, Matthew Cook (Armstrong's Vice President of Manufacturing Operations) held a meeting with Plaintiff and Ron Johnson (Armstrong's Vice President of Operations Excellence). Cook discussed his concerns that both Plaintiff and Johnson were not effectively convincing plant management of lean's value.  Cook stated that several plant managers had voiced complaints about both Plaintiff and Johnson.  According to Cook, Plaintiff and Johnson responded by stating that the plant managers would not listen to them and resisted them.

Notwithstanding that feedback, Plaintiff received a "fully effective" performance rating for the year 2010.  Armstrong's performance scale ranged from "least effective," "less effective," "fully effective," very effective," to "most effective."

In May 2011, Johnson resigned from Armstrong.  Plaintiff applied for his open position but was not selected.

Plaintiff testified that, in the summer of 2011, she complained to Donald Maier (Senior Vice President of Global Operations and Plaintiff's second-level supervisor) about Armstrong's male plant managers excluding her from emails related to lean efforts at plants for which she was responsible.  Plaintiff believed that this exclusion amounted to gender discrimination.[2]

---

[2] In its reply memorandum, Armstrong asserts that "Plaintiff admitted in her deposition that the first time she felt she was discriminated against was following her 2011 annual effectiveness report meeting, so any claim Plaintiff may make that she complained of alleged discrimination before that time is contrary to the record."  (ECF No. 56, at 8 n.3.)  In the testimony Armstrong cites in support of that assertion, however, Plaintiff testified that she first felt

As some point later in 2011, Armstrong hired external candidate Michael Bell for the position of Vice President of Operations Excellence.  Bell therefore became Plaintiff's direct supervisor.  Bell began his employment with Armstrong in November 2011, at which time he discussed his direct reports with John Bassett (Armstrong's then-Vice President of Human Resources) and Cook.  Both Bassett and Cook expressed displeasure with Plaintiff's performance.  Cook testified that he relayed negative feedback to Bell about Plaintiff from several plant managers, including one who was so upset by his interactions with Plaintiff that he did not want her back at the plant.

The parties do not dispute that Plaintiff did not get along with several of Armstrong's plant managers and management personnel.  For example, Plaintiff testified that, in January or February 2012, a manager at Armstrong's Macon plant refused to engage during an event Plaintiff facilitated or provide Plaintiff with certain documentation that she needed to do her job.  Plaintiff asserts that the same manager was supportive of a male Lean Director's preparation of a similar event at a later time.

Problems between Plaintiff and Armstrong's plant managers persisted.  In March 2012, plant managers and staff at the same Macon plant removed Plaintiff's access to an important database.  The parties dispute whether Bell took any action to restore her access after Plaintiff complained to him.  Plaintiff also testified that Cook and plant employees at Armstrong's Pensacola plant also purposefully excluded her from information she needed to do her job and that Bell did not take action in response to her complaints.

Similarly, although the evidence suggests that Plaintiff and Bell had an overall positive working relationship, Plaintiff asserts that Bell treated her differently than her male counterparts.

---

discriminated against *by Mr. Bell* after her 2011 annual effectiveness report meeting.  Armstrong's assertion mischaracterizes Plaintiff's testimony in this respect.

Plaintiff asserts that Bell assigned her to perform secretarial tasks related to a policy deployment report, while other Lean Directors did not have to perform those tasks. Plaintiff asserts that she complained to Bell "about being the only Lean Deployment Director tasked with administrative duties with respect to the policy development report." (*Id*. at 11.)[3]  Again, the parties dispute whether Bell took any action in response to Plaintiff's concerns.

Plaintiff's year-end review for the year 2011 took place in March 2012.  Despite being a recent hire, Bell was tasked with preparing Plaintiff's annual effectiveness report for the previous year.  Bell rated Plaintiff as "less effective," a rating which was one step down from the rating she had received the previous year.  Bell noted in the report that Plaintiff struggled to establish positive relationships with "key stakeholders," which included plant managers and personnel, Cook, and other employees tasked with lean implementation.  Bell reviewed the report with Cook, David Haggerty (Armstrong's then-Senior HR Manager), and Maier, all of whom concurred with the "less effective" rating.  Bell acknowledged that the review was based on feedback received from others and not his own personal knowledge or observations.

Bell met with Plaintiff to discuss the report.  Plaintiff testified that she was surprised and upset by the "less effective" rating.  According to Bell, Plaintiff blamed the stakeholders for her performance issues.

Plaintiff asserts that, during the meeting, she told Bell she was being treated unfavorably because of her gender and that such treatment was manifest in the feedback Bell had received. Bell understood that Plaintiff was complaining of gender discrimination at that time.  Bell testified that, after the meeting concluded, he met with or called Haggerty to share Plaintiff's

---

[3] Notably, Bell testified that he "took on most of the load for policy deployment preparation" after Plaintiff's employment was terminated.  (ECF No. 51-1, at 9.)

comments with him.  Bell testified that he told Haggerty that Plaintiff had implied gender discrimination in their meeting.[4]

Sometime after the performance review meeting, Haggerty met with Plaintiff.  During that meeting, which lasted approximately two to three hours, Plaintiff shared with Haggerty her complaints of gender discrimination.  Haggerty advised Plaintiff to call Armstrong's 800 number and file a complaint; however, Plaintiff elected not to do so.

In June 2012, Plaintiff was responsible for facilitating a lean value stream mapping event at Armstrong's Hilliard plant.  According to Hilliard's plant manager, Plaintiff argued with Yassmin Desoky (a Lean Master Engineer) to the point that neither was prepared for the event.  The plant manager advised Bell that it was in the Hilliard plant's best interests for Plaintiff not to return.  Bell then reassigned Plaintiff to plants and areas of responsibility other than Hilliard.  In response to an email from Bell confirming that reassignment, Plaintiff responded, "Sounds good.  The issues are primarily driven by Yassmin, and I am willing to work with her, but realize she is not prepared to do this."  (ECF No. 42-6, as 229.)

Bell testified that, in July 2012, he began to reach the conclusion that Plaintiff would not be effective in her position as a Lean Director.  He met with Lara Kreider (who replaced Haggerty in June 2012 as Senior HR Manager) to discuss his concerns.  Kreider instructed Bell to document Plaintiff's performance issues in order to create documentation supporting a termination decision that Kreider could present to Armstrong's severance committee.

---

[4] In her memorandum in opposition to Armstrong's motion, Plaintiff ignores this testimony from Bell and makes the following misrepresentation: "It is undisputed that [Plaintiff] complained to Bell of gender discrimination in March 2012.  However, Bell did not report the complaint to the HR Manager responsible for his division, investigate the complaints, or follow up on [Plaintiff's] complaints in any way."  (ECF No. 51, at 15.)  Plaintiff cites her own declaration as support for that statement.  Regardless of whether Haggerty was the "HR Manager responsible for [Bell's] division," the record simply does not support the statement that Bell never followed up on Plaintiff's complaint made during the performance meeting in March 2012.  Indeed, it is unclear how Plaintiff could make that sworn statement based on her own personal knowledge.

At or around that time, Bell began to create notes documenting his concerns about Plaintiff. That documentation includes a performance summary dated July 3, 2012 that memorializes some of the negative feedback Bell had received from plant managers about Plaintiff. The summary notes that Plaintiff did not receive her last performance rating well and had become very emotional. Bell stated:

> She expressed significant anger toward most of the ABP leadership team for causing her to get a low rating. She also implied gender discrimination. [Plaintiff] did not acknowledge that the problem was her responsibility and placed all of the blame on people other than herself. She made negative comments about AWI in general and about the character and professionalism of the stakeholders she is tasked with developing.

(ECF No. 42-4, at 25.) Bell also summarized specific comments (both positive and negative) received from several different plant managers and lean management personnel. Finally, Bell stated: "When confronted about all of these issues, [Plaintiff] expressed surprise and strongly defended herself. Her typical view is that she is trying to drive unpleasant change and that the organization is attacking her to avoid doing what needs to be done." (*Id*. at 27.)

Bell testified that he thought termination of Plaintiff's employment was warranted at the time he created the performance summary in July 2012; however, he received some positive feedback about Plaintiff from the Pensacola plant around that time. Bell testified that Plaintiff also showed some promise during that time and responded positively to recent training she had been receiving. Bell decided to hold off on terminating Plaintiff's employment.[5]

At the end of July 2012, Bell and Kreider met with Plaintiff for her mid-year performance review. Bell advised Plaintiff during the review that key stakeholders continued to express

---

[5] Plaintiff characterizes this testimony as an admission from Bell that, despite his efforts to terminate Plaintiff in the summer of 2012, there was no cause for termination at that time. Plaintiff also characterizes Bell's testimony as an admission that Plaintiff's performance "was, in truth, positive" during that time. (ECF No. 51, at 16.) Read in context, however, Bell clearly testified that Plaintiff showed positive changes in that time period that prompted him to "give her another chance." (ECF No. 42-3, at 77.) Plaintiff's suggestion in her brief that Bell admitted that the concerns reflected in his performance review were not accurate or that his initial efforts to terminate Plaintiff's employment were unwarranted is a mischaracterization of Bell's testimony. *See* ECF No. 107–109.

concern about her performance.  He stated that, if he were to give her a rating at that time, he would give her a "does not meet expectations" rating.

In the next several months, Bell continued to receive negative feedback regarding Plaintiff from other plant management personnel.  Plaintiff, in turn, continued to hold a negative view of plant management.  Plaintiff also complained to Bell about a dispute she had with a female executive assistant.

In September 2012, Plaintiff informed Bell that her husband had a heart condition that would require open-heart surgery.  Plaintiff testified that Bell was "very supportive" and told Plaintiff that, "if [she] needed time for [her] husband, that was no problem."  (ECF No. 42-5, at 357.)  Bell was "very interested" in the situation and "frequent[ly]" asked for updates as to how the condition was progressing.  (*Id*. at 360.)  When Plaintiff informed Bell at some point that she needed to take vacation time in order to care for her husband, Bell told her it was "no problem" and arranged for another lean employee to cover Plaintiff's responsibilities during the time she would be out.  (*Id*. at 453–454.)  It is undisputed that Plaintiff was never disciplined for taking time off to go to appointments for her husband (which she did in September 2012) or working remotely in order to be with her husband during that time.

In October 2012, Bell, Cook, Plaintiff, and Armstrong's other Lean Directors participated in a strategic planning meeting.  Bell testified that Plaintiff made several negative comments about her stakeholders (including Cook) during that meeting.  Bell also testified that Plaintiff raised the issue of gender during the meeting and "the challenges associated with being a woman in this environment."  (ECF No. 51-1, at 390.)  Bell testified that he decided during that meeting that Plaintiff's relationships with her stakeholders were broken beyond repair and that termination was appropriate.

Following the meeting, on October 20, 2012, Bell updated the written performance summary that he had created in July.  He added more recent feedback from stakeholders regarding Plaintiff's performance struggles.  He also summarized the aforementioned meeting as follows:

> I scheduled a strategic planning session in early October in Lancaster to refine our approach to lean.  This included diagnosing our challenges, further developing the lean roadmap, and clarifying roles for all stakeholders as it pertains to implementing lean principles.  Participants included Matt Cook, Simon Pulford, Paul Spitzer, and [Plaintiff].  I met with [Plaintiff], Paul, and Simon in advance of this meeting to begin narrowing our focus and content. [Plaintiff] was extremely negative regarding expectations for the meeting and kept bringing up past similar events that were unproductive. She was openly critical of Matt Cook and all of the Plant Managers. Her comments were pulling the group down and I told her to stop being so negative and to focus instead on moving forward. During the meeting with Matt, the conversation was free-flowing, candid, and productive. A key development was agreement among the team that the Lean Directors' role need to transition  away from primarily facilitating events and become change agents to coach leadership in applying lean principles  and tools. As soon as Matt left the room, [Plaintiff] again went on the attack mode, bringing up past meetings similar in nature and giving examples of how Matt could not be trusted. It was at this point that I realized this relationship was irreparably broken and that [Plaintiff] would never be successful in her role as a Lean Director, especially as a valued coach for Plant Managers and above.

(ECF No. 42-4, at 22–23.)

Having concluded that termination was warranted, Bell also added a section to the document titled "Other points that might be relevant in determining the appropriate severance approach."  (*Id*.)  In that section, he listed the following points:

- Work ethic is not the problem. [Plaintiff] works late, works weekends, and works on holidays when deadlines are involved. She will do whatever is required to complete a specific task that is requested of her.
- [Plaintiff] frequently makes comments about discrimination within ASP.  She points out the number of white men in the room whenever plant manager conferences are held. Whenever I give her negative feedback and attempt to coach for improvement, she brings up the gender issue as a reason she is not being viewed as help by ABP leadership. Just last week she pointed out that Julie Hinds and Charlotte Gombos are not included in key

8

decision-making meetings at Millwood. [Plaintiff] said Julie was very "beat down and discouraged" as a result.

- [Plaintiff] and her husband are planning on taking a week-long vacation in Europe starting on 11-2-2012. The week she returns will be the week of Thanksgiving and she plans on working from home. Her husband is scheduled for a major medical procedure on 11-27-2012 that will require her to miss work that week as well. [Plaintiff] recently became very emotional when telling me about her husband's medical issues.

- My preference is to move as quickly as possible in severing [Plaintiff] from the company. I am satisfied that she has been given every opportunity to succeed at Armstrong. She has received two consecutive negative performance reviews, is clearly miserable in her job, but has not yet found employment outside of Armstrong. I suspect she has no intent of leaving the company voluntarily.

(*Id.*)

On November 6, 2012, Bell and Kreider met with Plaintiff to inform her that her employment was terminated. The reason given for termination was that Plaintiff's relationships with key stakeholders were broken. Kreider presented Plaintiff with a proposed separation agreement that offered severance and benefits through December 31, 2012 and informed Plaintiff that she had twenty-one days to consider the same. Two weeks later, when Plaintiff asked for more time to review the proposed separation agreement, Kreider denied the request but indicated that Armstrong would extend the proposed severance and benefits by an additional month to January 31, 2013. Plaintiff opted not to sign the separation agreement.

Armstrong has not yet filled Plaintiff's position. According to Bell (Armstrong's Rule 30(b)(6) witness), Plaintiff's former job duties have been divided among several male employees.

Plaintiff filed this lawsuit on May 16, 2013 alleging claims of interference and retaliation under the Family Medical Leave Act ("FMLA") and gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and Chapter 4112 of the Ohio Revised Code. Plaintiff asserts that Armstrong's actions were willful such that it is liable for punitive damages.

Armstrong now moves for summary judgment on each of Plaintiff's claims. That motion is fully briefed and ripe for the Court's consideration.

## II.    ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251–52).

### B. FMLA Interference and Retaliation

The Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"), gives certain employees the right to take unpaid leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition.  It is undisputed in this case that Armstrong is an employer subject to the FMLA, that Plaintiff was eligible for FMLA protection, and that Plaintiff's husband's heart condition constituted a "serious health condition" within the meaning of the FMLA.

Plaintiff's FMLA claim rests on two theories of liability: interference and retaliation. "The 'interference' theory is based on 29 U.S.C. § 2615(a)(1), which states that employers cannot 'interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided . . .' by the FMLA."  *Gates v. U.S. Postal Serv.*, 502 F. App'x 485, 488–89 (6th Cir. 2012).  "The 'retaliation' or 'discrimination' theory arises from 29 U.S.C. § 2615(a)(2), which states that an employer cannot 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.' "  *Id*.

Plaintiff can prove her FMLA interference and retaliation claims by direct evidence or indirect evidence under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).  *Gates*, 502 F. App'x at 489.  "Under the direct method, a claimant relies on evidence that requires no inference or presumption to prove the existence of a fact."  *Chandler v. Specialty Tires of Am. (Tenn.), Inc*., 134 F. App'x 921, 927 (6th Cir. 2005) (citing *Barnes v. Goodyear Tire and Rubber Co.,* 48 S.W.3d 698, 705 (Tenn. 2000)).  "If the evidence requires the jury to infer some further fact, it is not direct evidence."  *Id*.  (citing *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1081 (6th Cir. 1994)).

Here, Plaintiff argues that the performance summary Bell updated in October 2012 is direct evidence that Armstrong terminated her employment in retaliation for her prior FMLA leave and need for additional FMLA leave.  As stated above, that document (which Bell created at the HR Senior Manager's request in order to support a termination decision) summarizes feedback received from various plant managers and lean management personnel, most of which expresses displeasure with Plaintiff's job performance.  That document also memorializes Bell's performance meetings with Plaintiff, the advice he gave to her about how to improve performance, and Bell's impressions from the October 2012 meeting in which he "realized [the relationship between Plaintiff and Cook] was irreparably broken and that [Plaintiff] would never be successful in her role as a Lean Director, especially as a valued coach for Plant Managers and above."  (ECF No. 42-4, at 23.)  Finally, the document includes a section labeled "[o]ther points that might be relevant in determining the appropriate severance approach," one of which references the fact that Plaintiff planned to miss work during the week of her husband's medical procedure.  (*Id*.)

The Court agrees with Armstrong that this document is not direct evidence of FMLA retaliation or interference.  To the contrary, the document suggests that Bell considered various factors (such as feedback from stakeholders and Plaintiff's comments about Cook) in making the termination decision, and that he considered other factors (such as Plaintiff's leave request) as potentially relevant in determining the appropriate "severance approach."  To conclude, as Plaintiff does, that Bell considered those other factors (such as the leave request) relevant to the termination decision in addition to the severance approach would require the jury to make an additional inference or presumption that the document itself does not prove.  As such, the document is not direct evidence of FMLA retaliation or interference.

The Court therefore must apply the *McDonnell Douglas* burden-shifting framework to evaluate the evidence in this case.  *Gates*, 502 F. App'x at 489.  To satisfy that framework, Plaintiff must first establish a prima facie case as to her interference and retaliation claims.  *Id.* (citing *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir. 2007)).  If successful, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Id.*  "If the employer satisfies its burden of production, the plaintiff must show that the proffered reason is a pretext for unlawful discrimination."  *Id.*

### 1. FMLA Retaliation

To establish a prima facie claim for FMLA retaliation, Plaintiff must establish that:

(1) [s]he was engaged in an activity protected by the FMLA; (2) the employer knew that [s]he was exercising [her] rights under the FMLA; (3) after learning of [her] exercise of FMLA rights, the employer took an employment action adverse to [her]; and (4) there was a causal connection between [her] protected FMLA activity and the adverse employment action.

*Gates*, 502 F. App'x at 489 (citing *Donald v. Sybra, Inc.,* 667 F.3d 757, 761 (6th Cir. 2012)). Plaintiff asserts that Armstrong took an adverse employment action against her by terminating her employment after she requested FMLA leave.

The first issue for the Court is whether, based on the evidence presented, a reasonable jury could find a causal connection between Plaintiff's request to take two weeks of vacation to care for her husband and Armstrong's decision to terminate her employment.  The second issue is whether, assuming such a causal connection exists, a reasonable juror could find that Armstrong's stated reason for termination (that her relationships with key stakeholders was

irreparably broken such that she could not effectively perform her job)[6] is a pretext for retaliation.

In support of her position, Plaintiff cites two pieces of evidence: the temporal proximity between her request for time off (in late September 2012) and Bell's decision to terminate her employment (in October 2012), and the fact that Bell "specifically referenced Armstrong's FMLA leave request in the document he submitted in support of her termination."  (ECF No. 51, at 38.)  The Court agrees with Armstrong, however, that this evidence is insufficient to create a genuine issue of material fact as to cause or pretext.  Even viewing the October 2012 performance summary in the light most favorable to Plaintiff, a reasonable jury could not conclude that Plaintiff's request for leave time played any role in Bell's decision to terminate her employment.  The document clearly references Plaintiff's request for leave time in a section separate from that in which Bell memorializes the factors leading to his termination decision (including Plaintiff's comments at the October 2012 meeting).  Notably, Plaintiff does not dispute any of the facts that Bell purportedly considered relevant to his termination decision, such as the facts that she made certain comments about Cook during the October 2012 meeting and/or that her relationship with Cook was irreparably broken.

Moreover, the fact that Bell considered Plaintiff's leave request potentially relevant to the "severance approach" is not evidence that he also considered it relevant to the decision to terminate her employment.  To conflate the two issues simply because Bell referenced them in the same document is not a reasonable inference to draw.  That is especially true in light of the undisputed evidence as a whole, which shows that Bell documented Plaintiff's performance

---

[6] Assuming Plaintiff can establish a prima facie case, she cannot seriously dispute that Armstrong set forth a legitimate, nondiscriminatory reason for the adverse employment action.  Armstrong offered substantial evidence (in the form of testimony and documents) setting forth its position that Plaintiff's job performance suffered due to relationship issues with plant managers and lean management personnel.  Indeed, although Plaintiff disputes the reason, she does not dispute that such relationship issues existed.  Armstrong therefore satisfies its burden of persuasion on this issue.

issues and discussed terminating her employment long before she requested leave time, that Bell was supportive of Plaintiff's request for leave time (including arranging for another employee to cover for her in November when she planned to take time off), and that Armstrong did not discipline Plaintiff in any way for taking time off to care for her husband in September.

Plaintiff therefore is left with the temporal proximity between her request for leave and Armstrong's decision to terminate her. But temporal proximity alone cannot create a genuine question of material fact in this instance. For one thing, the Sixth Circuit has stated that temporal proximity can only establish a causal connection if it is "coupled with other indicia of retaliatory conduct," of which there is none in this case. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006); *see also Allen v. City of Sturgis*, 559 F. Supp. 2d 837, 849 (W.D. Mich. 2008) ("[T]emporal proximity is insufficient in and of itself to establish that the employer's [lawful] reason for discharging him was in fact pretextual.' " (citing *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003))). Second, as stated above, the undisputed facts show that Bell considered terminating Plaintiff's employment before she requested leave time and that Plaintiff made what Bell considered to be negative comments about a lean management colleague during an important meeting in October 2012, thus making any temporal connection between Plaintiff's leave request and the termination decision even less probative in this case than it might be in other cases. Plaintiff therefore failed to demonstrate that a genuine question of material fact exists as to whether her request for leave time influenced Armstrong's decision to terminate her employment.

In light of the foregoing, the Court **GRANTS** Armstrong's motion for summary judgment on Plaintiff's FMLA retaliation claim.

## 2.  FMLA Interference

To establish a *prima facie* case of interference under the FMLA, Plaintiff must prove that: (1) she was an eligible employee; (2) Armstrong was an employer subject to the FMLA; (3) she was entitled to FMLA leave; (4) Armstrong had notice of her intention to take FMLA leave; and (5) Armstrong denied her FMLA benefits to which she was entitled.  *Gates*, 502 F. App'x at 489 (citing *Romans v. Mich. Dep't of Human Servs.,* 668 F.3d 826, 840 (6th Cir. 2012)). Regarding the fifth factor, the Sixth Circuit has stated:

> If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled. We, therefore, have no objection to rephrasing the fifth element of an interference claim as being that the employer has 'somehow used the leave against her and in an unlawful manner, as provided in either the statute or regulations.'

*Wysong v. Dow Chem. Co*., 503 F.3d 441, 447 (6th Cir. 2007).

Plaintiff asserts that Armstrong denied her the benefit of FMLA leave by terminating her employment.  Plaintiff does not explain or offer any argument as to how her interference claim differs from her retaliation claim.

Having found that no genuine issue of material fact exists as to whether Plaintiff's leave request influenced Armstrong's decision to terminate her employment, the Court concludes that Plaintiff's FMLA interference claim similarly fails.  Once Armstrong made the lawful decision to terminate Plaintiff's employment, it was not obligated to delay taking that action to allow Plaintiff to exercise her FMLA leave.  To the contrary:

> [A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request. An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.

*Mann v. Navicor Grp., LLC*, 488 F. App'x 994, 1001 (6th Cir. 2012) (quoting *Arban*, 345 F.3d at 401) (internal quotations omitted)).

Here, as stated above, there is simply no evidence to suggest that the termination decision would not have occurred absent Plaintiff's leave request.  Plaintiff therefore cannot demonstrate a question of fact as to whether Armstrong took an employment action based on the fact that she requested FMLA leave.  The Court therefore **GRANTS** Armstrong's motion for summary judgment on Plaintiff's FMLA interference claim.

### C.  Gender Discrimination and Retaliation

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Title VII also provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."  *Id.* § 2000e-3(a).  Plaintiff invokes each of these sections and asserts that Armstrong violated Title VII by discriminating against her on the basis of sex and by retaliating against her for opposing gender discrimination.[7]

Plaintiff can prove her claims through direct or indirect evidence.  *See, e.g., White v. Columbus Met. Housing Auth.*, 429 F.3d 232, 238 (6th Cir. 2005).  In Title VII cases, "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Id.* (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).  Once the plaintiff

---

[7] Plaintiff also asserts that the same conduct violates Ohio Revised Code 4112.02.  Because the same analysis applies to the federal statute and the state statute, see *Fiedderman v. Daiichi Sankyo*, 930 F. Supp. 2d 899, 908 (S.D. Ohio 2013), the Court considers these claims together.

has produced credible direct evidence, the burden shifts to the employer to show that it would have taken the employment action of which the plaintiff complains even in the absence of discrimination. *Id.*

In contrast, when a plaintiff seeks to assert his or her claim using indirect evidence, courts assess that evidence under the *McDonnell Douglas* burden-shifting framework discussed above. *Id.* Under this framework, once the plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment decision at issue. *Id.* (citing *Seay v. Tenn. Valley Auth.,* 339 F.3d 454, 463 (6th Cir. 2003)). If the defendant meets this burden, the plaintiff must establish that the defendant's stated reason is mere pretext for its true discriminatory motives. *Id.*

### 1. Gender Discrimination

To prove her claim that Armstrong discriminated against her because she is a woman, Plaintiff offers the "direct evidence" that an Armstrong employee (who was not a decisionmaker in any process in which Plaintiff claims she was discriminated against) "contemptuously" referred to a women's leadership development course as "women's lib training." (ECF No. 51, at 43.) Isolated and ambiguous comments such as that one, however, are insufficient to support a finding of direct discrimination. *White*, 429 F.3d at 239. That the comment was not made by a decisionmaker also disqualifies it from being direct evidence of discrimination. *Mann*, 488 F. App'x at 998. Accordingly, Plaintiff has no direct evidence of gender discrimination, and the Court proceeds to the *McDonnell Douglas* burden-shifting analysis.

The question here is whether the evidence indirectly supports a finding that Armstrong discharged or discriminated against Plaintiff because she is a woman. To establish her prima facie case, Plaintiff must prove that: "(1) she is a member of a protected group; (2) she was

subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Id.* (quoting *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)). Regarding the second element, Plaintiff asserts that she was subject to adverse employment decisions in that she was paid less than male comparators performing the same role and that she was fired and replaced with men while other men were not fired for the same or similar conduct.

Plaintiff's arguments regarding unequal pay do not support a sex discrimination claim. Of the two male employees performing her identical role (Director Lean Development – ABP), one was paid more than Plaintiff and one was paid less. Armstrong offered evidence that it paid the former employee a higher annual salary than Plaintiff because of his superior qualifications. Armstrong also offered evidence that the other male employees Plaintiff identified as receiving higher salaries reported to different supervisors with different job responsibilities in different plants. As such, even if Plaintiff could make out a prima facie case of discrimination based on pay, Armstrong sufficiently set forth a legitimate, non-discriminatory reason for the pay differences. Plaintiff does not attempt to offer any evidence that those reasons are pretextual.

Plaintiff does, however, establish a prima facie case with respect to her termination. It is undisputed that Plaintiff is female, was qualified for her position but was terminated, and that two males performing her identical position (Director Lean Development – ABP) were not terminated. Plaintiff's extraneous comments in this section of her brief—that another ABP employee who was not similarly situated was given several chances to overcome negative

performance reviews and that Armstrong voluntarily offered development opportunities for males while Plaintiff had to ask for them[8]—are not relevant to her prima facie case.

The burden of persuasion then shifts to Armstrong, which provided evidence that Plaintiff was discharged not because she is female but because she received negative feedback from key stakeholders.  Armstrong also provided evidence that the two male Directors of Lean Development – ABP were not terminated because they did not underperform to the same level as Plaintiff.  This evidence is sufficient to satisfy Armstrong's burden of persuasion and shift the inquiry back to Plaintiff.

The question now becomes whether the evidence could support a finding that Armstrong's stated reason for Plaintiff's termination is merely a pretext to cover the fact that it fired her because of her gender.  To demonstrate pretext, "a plaintiff must show that the defendant's articulated legitimate, nondiscriminatory reason: (1) lacks a basis in fact, (2) did not actually motivate the defendant's actions, or (3) was insufficient to motivate the defendant's actions."  *Carroll v. Ohio Dep't of Admin. Servs*., 555 F. App'x 512, 515 (6th Cir. 2014) (citing *Vincent v. Brewer Co*., 514 F.3d 489, 497 (6th Cir. 2007)).

Plaintiff offers several arguments to suggest pretext; however, those arguments mischaracterize select portions of evidence in an attempt to create factual issues where none exist.  Plaintiff asserts, for example, that Armstrong's given reason for termination is not credible because no cause existed to terminate Plaintiff in summer 2012.  But as stated above, that argument mischaracterizes Bell's testimony that he felt Plaintiff was underperforming in summer 2012 but received positive feedback around that time and concluded that termination would be premature.  That argument also ignores the fact that Bell testified about a specific event in

---

[8] Plaintiff acknowledges that when she did request approval to attend an Executive Leadership institute for Women, Bell approved the request.

October 2012 that, when combined with the negative feedback received and documented earlier, led Bell to conclude that termination was appropriate. The record also does not support Plaintiff's argument that Bell could not identify specific comments that led him to conclude that Plaintiff's key relationships were broken. In fact, Bell's performance summary dated October 20, 2014 identifies several specific comments from stakeholders that Bell considered relevant to his termination decision. *See* ECF No. 42-4.

Plaintiff's argument that Armstrong offered multiple, inconsistent explanations to justify her termination similarly mischaracterizes the record. Plaintiff cites the testimony of Lara Krieder, the HR Manager involved in the termination but not directly responsible for making the decision, as evidence that the personality conflict between Plaintiff and Yassmin Desoky did not contribute to Plaintiff's termination such that Armstrong's reference to Desoky in its motion is an "eleventh-hour" attempt to justify its actions. (ECF No. 51, at 34.) But the document Bell created in support of his decision to terminate Plaintiff's employment specifically notes the following comments from Hilliard's plant manager: "I would prefer not to have [Plaintiff] support my plant at this time because the personality conflict between her and Yassmin creates such a huge distraction." (ECF No. 42-2, at 20.) The relationship issues between Plaintiff and Desoky (who is female) also directly contradict Plaintiff's claim that all the negative feedback about her came from men acting with a discriminatory animus. Accordingly, Plaintiff's poor working relationship with Desoky (which Plaintiff does not dispute) is consistent with Armstrong's stated reason for termination and does not suggest pretext.

Plaintiff also argues that Armstrong's stated reason for termination is not credible because Armstrong failed to verify the feedback it received about Plaintiff. That argument misses the point. Armstrong asserts that it terminated Plaintiff because she did not work well

with her key stakeholders (including plant managers she was responsible for leading).  The fact that these stakeholders expressed displeasure with Plaintiff's performance—regardless of the basis for that displeasure—is directly relevant to Armstrong's stated reason for termination.  And the fact that Bell memorialized this feedback after he received it (i.e., at a later date) in order to justify his termination decision is not probative of the issue of pretext.

The additional evidence Plaintiff offers to show pretext does not refute Armstrong's stated reason for termination.  Plaintiff again mischaracterizes the testimony in this case by arguing that Armstrong failed to follow its own policies in reporting allegations of discrimination to HR.  As stated above, however, Bell testified that he reported Plaintiff's initial complaints in March 2012 to then-Senior HR Manager Dave Haggerty, who (according to Plaintiff's own testimony) met with Plaintiff for two to three hours to discuss the issue.  Plaintiff's assertion that "Armstrong refused to investigate [Plaintiff's] complaints," (ECF No. 51, at 33), supported by Kreider's statement that she did not investigate the allegations, (*id*. at n. 194), is similarly misleading.  Kreider—who became Senior HR Manager in June 2012—testified that she did not investigate Plaintiff's allegations from March 2012 because she assumed her predecessor (Haggerty) would have done so.  This evidence does not indirectly suggest that Armstrong fired Plaintiff because she is female.

Plaintiff then argues that evidence of pretext exists because males were treated more favorably than she was, but Armstrong provided evidence to justify any such differences.  As discussed in connection with Plaintiff's prima facie case, Plaintiff failed to provide evidence that those justifications are not credible.

Finally, Plaintiff asserts that evidence of pretext exists because "Bell made the decision to terminate [her] during a meeting in which she complained about gender discrimination," (ECF

No. 51), but that assertion is relevant to her retaliation claim and not her gender discrimination claim. Any temporal connection between the two events is not indirect evidence that Armstrong fired Plaintiff because of her gender.

Having found no evidence that could support a finding of pretext, the Court concludes that there exist no genuine issues of material fact with respect to Plaintiff's gender discrimination claims under Title VII and Chapter 4112 of the Ohio Revised Code. The Court therefore **GRANTS** Armstrong's motion for summary judgment on these claims.

### 2. Title VII Retaliation

As an initial matter, Armstrong suggests in its brief that it cannot be liable for Title VII retaliation because Plaintiff did not engage in protected activity but offers no substantive argument to that effect. As such, the Court will not consider that issue and will assume that Plaintiff's complaints of gender discrimination constitute protected activity for purposes of this Opinion and Order. The question therefore becomes whether Armstrong discriminated against Plaintiff because she complained of gender discrimination.

Plaintiff cites three pieces of evidence as direct evidence of retaliatory discrimination. First, Plaintiff asserts that "direct evidence" of retaliation exists because "Bell testified that he decided to terminate [Plaintiff] in the very same October 2012 meeting in which she complained of gender discrimination." (ECF No. 51, at 23.) But it is axiomatic that an employee cannot insulate himself or herself from adverse employment decisions simply by claiming gender discrimination at the same time he or she underperforms or receives negative feedback. The issue for the Court is not whether the timing of Plaintiff's complaints correlates to Armstrong's termination decision, but whether the evidence supports a finding that Armstrong made its decision *because of* those complaints. Timing may be relevant to that question; however, it

certainly does not compel the conclusion that unlawful discrimination took place.  The fact that Plaintiff complained of discrimination at the same meeting at which she spoke negatively of Cook (which, according to Bell, was the impetus for termination) is not direct evidence that Armstrong engaged in unlawful retaliation.

Second, Plaintiff argues that "Bell went even so far as to admit that his decision to terminate was motivated by 'more than just [Langenfeld] raising concerns [of gender discrimination],' thereby tacitly admitting that her raising concerns of discrimination were, in fact a motivating factor in his decision to terminate her employment," (ECF No. 51, at 23), but cites testimony that is entirely unrelated to that argument or quote.  *See* ECF No. 51, at 23 n.147 (citing Bell Dep. at 144:15-20, in which Bell discusses feedback received from stakeholders).  To the extent Plaintiff is referring to the following exchange:

> Q:    Okay.  But at least in terms of timing, you made – you decided for the first time that [Plaintiff's] relationships with her stakeholders were irreparably broken in the same meeting in which she raised concerns about working in that environment as a woman, correct?
>
> A.    Well, it was – it was more than just raising concerns.  It was the personal comments about, you know, Matt Cook and the things she expressed.

(ECF No. 51-1, at 40–41), Bell's answer is not direct evidence of retaliation.  At most, that answer is ambiguous with respect to retaliatory intent, and ambiguous comments are insufficient to support a finding of direct discrimination.  *White*, 429 F.3d at 239.  Moreover, the more reasonable interpretation of Bell's answer is that he was clarifying what took place at the meeting and not "admitting" to any motivations for his decision.  Plaintiff's argument on this point therefore fails.

Plaintiff's final argument regarding direct evidence presents a much closer call.  The performance summary Bell created in July 2012 and updated in October 2012, the purpose of

which was to document the reasons Bell believed termination was appropriate, contains the

following remarks:

> [Plaintiff] did not receive this feedback well and became very emotional. She
> expressed significant anger toward most of the ABP leadership team for causing
> her to get a low rating. She also implied gender discrimination. [Plaintiff] did
> not acknowledge that the problem was her responsibility and placed all of the
> blame on people other than herself. She made negative comments about AWI
> general[sic] and about the character and professionalism of the stakeholders
> she is tasked with developing.

> I made clear to [Plaintiff] that, despite her feelings toward her customers, it is
> her responsibility to resolve the issues, improve her effectiveness, and be
> viewed as a vital resource . . . .

(ECF No. 42-4.)[9]  Unlike the FMLA comments discussed above, these remarks are in the body

of the performance summary and not in the section titled "[o]ther points that might be relevant in

determining the appropriate severance approach."  (ECF No. 42-2, at 21, 23.)  Armstrong does

not address these specific comments in its briefs.

At first blush, Bell's specific comment that Plaintiff "implied gender discrimination"

appears to support a direct finding that Bell used protected activity against Plaintiff in evaluating

her performance.  But that conclusion relies on the additional inference that each of Bell's

comments in the performance summary was a motivating factor in his termination decision.

Bell's comment therefore does not *require* the conclusion that unlawful discrimination was a

motivating factor in Armstrong's actions.  As such, the comment cannot constitute direct

evidence of retaliation.  *See White*, 429 F.3d at 238; *Chandler*, 134 F. App'x at 927.

The Court therefore turns to indirect evidence of retaliation.  To establish her prima facie

case, Plaintiff must demonstrate that she engaged in protected activity, that her protected activity

was known to her employer, that a materially adverse action was taken against her, and that there

---

[9] Plaintiff purports to cite testimony in which Bell discussed that statement but again, the cited testimony does not
match the selected excerpts. *See* ECF No. 51, at 24 n.148 (citing Bell Dep. at 90:22–91:19, in which Bell discusses
taking handwritten notes).

was a causal connection between her protected activity and the adverse action.  *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997)).  Armstrong argues that no evidence of a causal connection exists in this case.

The Court disagrees.  Bell's comment in the performance summary discussed above creates a question of fact as to whether there exists a causal connection between Plaintiff's complaints of discrimination and Bell's decision to terminate her employment.  Two points are relevant here.  First and most importantly, Bell testified that he prepared the performance summary to justify his termination decision, and the statement that Plaintiff "implied gender discrimination" is contained within the body of that document (as opposed to the separate section titled "[o]ther points that might be relevant in determining the appropriate severance approach").  Those facts could support a finding that Bell considered Plaintiff's complaints relevant to his decision to terminate her employment.  Second, Bell's comments in the performance summary suggest that he interpreted the protected activity in a negative way—i.e., as an attempt by Plaintiff to shift responsibility for her relationship issues to other individuals—which similarly could suggest a causal connection between the protected activity and the termination decision.  Sufficient evidence therefore supports Plaintiff's prima facie case.

Because Armstrong established a lawful reason for Plaintiff's termination, the question becomes one of pretext.  In this instance, because there exists other indicia of retaliation, the temporal connection between Plaintiff's discrimination complaints in the October 2012 meeting and Bell's decision to terminate her employment during that same meeting creates a question of fact regarding pretext.  *Cf. Green v. Wal-Mart Stores, East, L.P.,* No. 3:11-cv-440, 2013 WL 3223629, at *8 (June 25, 2013) (finding a temporal connection sufficient to establish pretext

when viewed in connection with other evidence).  Viewed in context and in connection with Bell's comments in the performance summary, a reasonable jury could conclude that the proffered impetus for Plaintiff's termination (negative comments she made during the October 2012 meeting) is a pretext for retaliatory conduct.  Summary judgment therefore is improper on this claim.  The Court **DENIES** Armstrong's motion with respect to Plaintiff's retaliation claims under Title VII and Chapter 4112 of the Ohio Revised Code.

### D.  Punitive Damages

Armstrong argues that Plaintiff cannot recover punitive damages because there exists no evidence of intentional discrimination.  Having found, however, that there exists a genuine question of material fact with respect to Plaintiff's Title VII and state-law retaliation claims, the Court agrees with Plaintiff that the issue of intent is best reserved for the factfinder.  The Court therefore **DENIES** Armstrong's motion for summary judgment on the issue of punitive damages.

### III.    CONCLUSION

For all of the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Armstrong's motion for summary judgment.  (ECF No. 41.)  Specifically, the Court **GRANTS** Armstrong's motion with respect to Plaintiff's claims for FMLA interference, FMLA retaliation, Title VII gender discrimination and gender discrimination under Ohio Revised Code Ch. 4112. The Court **DENIES** Armstrong's motion with respect to Plaintiff's retaliation claims under Title VII and Ohio Revised Code Ch. 4112 as well as Plaintiff's request for punitive damages.

**IT IS SO ORDERED.**

                             **/s/ Gregory L. Frost**
                             **GREGORY L. FROST**
                             **UNITED STATES DISTRICT JUDGE**